Please the court. Let me say at the outset that I've got a bad case of laryngitis. I will do my best. My name is Paul Exine. I'm appearing on behalf. But are we missing your opponent here? Counsel was here earlier. Let's wait. I think we might have overshot our 15 minutes, I guess. That's okay. I think we came out early. Please the court. My name is Paul Exine. I'm a lawyer with Perkins Coie, Brown and Bain in Phoenix. I represent the plaintiff appellant, Marlyn Nutraceuticals. The trial court's opinion granting the preliminary injunction in this case is infused with error. The trial court got off on the wrong foot by stating at page 15 of her opinion, quote, Marlyn does not dispute Mucos's claims of probable success on the merits. There is absolutely no evidence, no evidence to support that statement. If the court will look at pages 33 and 34 of the transcript of the preliminary injunction hearing, you will see that Marlyn very much disputed, contested, debated Mucos's claim that there was probable success on the merits. I don't know how the judge made that statement. I think she confused what happened later in that colloquy with respect to the sleek craft standards that had nothing to do with probable success on the merits. But the judge was absolutely wrong. Now, the judge got off on the wrong foot and then proceeded to commit four errors that we describe in our opening and responsive brief. I will talk about two of those errors today. That does not mean that I believe the errors with respect to reversing the standard of proof, the burden of proof, and the refusal to take evidence that the plaintiff, which was defending the preliminary injunction, did not have an opportunity to present are any less meritorious. But I have 15 minutes, and so I want to focus my time on the other two arguments. And those arguments are, I'll call it the contract argument and the remedy argument. Let's start with the contract argument. The first. Before you get to that, could you answer a question for me? What has happened in the trial court since the entry of the preliminary injunction? Are you set for trial? It is not part of the record, but if I may answer. There is no trial setting, but the mucos, the defendant, Apolli, filed a motion for contempt, civil contempt, on failure to make recall and failure to do complete restitution. That's on the preliminary injunction. But what's happened towards the permanent injunction? Well, there's no trial setting and there is no permanent injunction. I don't understand. Why isn't the proceeding going ahead in the district court towards the permanent injunction? Well, the proceeding, the reason the proceeding hasn't moved any faster is that mucos asked for civil contempt. And from really the spring until August of this year, the court has been tied up, in this case, on the civil contempt motion. And pending before the court today is, and for the last several weeks, is a motion for damages under the contempt order that Judge Silver has entered. The judge has not, despite efforts by the parties to move the case along, not done that and has focused on the contempt motion. Well, I don't mean to take up your time, counsel, but it seems you both counsels should be aware of our sports forum case, in which we've been very clear that we don't want a lot of delays. This is a preliminary matter. The main action should be the permanent injunction, if there is one. Now, we understand why we're here, especially with the recall. But we anticipate, we would anticipate that there would be more movement in the trial court. So maybe you can call the district court's attention to our sports forum case, in which we've been very clear on that issue. But why don't you go ahead? Well, I will do that. And I might say that I am fairly recently in the case, was not in the case at the outset. Some district court judges tend to hold up when there's a preliminary injunction appeal, but it is an interlocutory appeal. We did ask for a stay at the trial court level, which was denied. Well, Section 13 of the contract, the distribution agreement, makes it very clear in the prefatory comment that certain terms are set out in the contract. And that's what it says. It contains the following terms and such other terms as may be mutually agreed upon. And if you look at it, as I know you have, the full text of Section 13, you can see that there are term, there's price, there's a royalty figured in, there's a forum dispute clauses. It is complete. And under the Schotty case, Schotty v. Dietrich in Arizona, one looks at whether the disputes can be resolved on the basis of what is in the contract. Did MUCOS ever cease production of the thing I can't pronounce? Wobbenzine. Did they ever cease production? Well, that's in part what this case is about. Well, I'm asking you what the record shows on that matter. Did they ever cease production? In our view, they did, yes. And they ceased production because the formula was changed. And under German law, which is the governing law, if you look at the civil code, Section 434.1, when there is a defect in the product, there is a ceasing of production. And that's exactly what happened here. The defect of the product isn't based on whether it is in fact harmful or not. It is based on whether there's a change in the composition of the product. The translation that Ms. Aldama of our office, who's a German speaker, provided to the court makes that very clear. And the composition of the product changed. Now, there's a big dispute about whether the composition is harmful or not harmful or meaningful or not meaningful. But clearly the composition did change. The papain that was advertised on the label said that there were 100 milligrams of papain. Turns out there were 60. Now, mucose explains and explained at the trial court that you look at both the composition, the weight, the milligrams, and you look at the enzyme activity. There was a dispute in the evidence as to whether that really matters. And, in fact, their expert, Dr. Kruger, said 10 experts would agree that it doesn't matter, 10 experts would agree that it does matter. Nevertheless, the German law is clear, and they did not respond to it in their reply brief. But I think maybe the question is they're still producing a pill that bears the name and has the same physical form, not composition form. That's where we are. Well, still producing is really the question because they were not producing and selling in the United States. Wolfenstein Marlin had an exclusive distributorship. It wasn't until at least a month later, December of 2007, that mucose began producing and shipping in the United States. But they did in Germany. They were not manufacturing the product regardless of where it was distributed. They were manufacturing before. A product that was labeled. That was correct, but not distributing in the United States. So I think under Arizona law, it's absolutely clear that there was a contract. But even if Arizona law were not clear, under doctrines of promissory estoppel, equitable estoppel, and partial performance, it's also clear. Now, the trial court said there was no detriment because Marlin made some money on the sale of Wolfenstein. But in fact, had there not been an agreement, it would have done what it is doing now, and that is producing a product under its own name and own label so that it could establish the goodwill. Mucose says that it was a mistake in the record when they say that mucose acknowledged that Marlin had enhanced the value of the product and the goodwill of the product. Well, whether it's a mistake or not, they clearly did. By marketing the product in the United States, Marlin clearly established goodwill for that product, which benefited mucose, and they could have done it for themselves. Let me take a moment or two before I sit down and reserve some time and talk about the remedies that were imposed. There is no case that I've been able to find, and none that mucose has cited, that provides in a preliminary injunction context that restitution is a remedy. We'll talk about recall in a moment. Restitution doesn't benefit mucose. It doesn't deal with any irreparable harm. There is absolutely no basis for issuing a restitution order. And with respect to recall, the evidence, again, the judge made a statement that there is no evidence in the record that the public was being harmed by the fact that there was some Marlin product on the shelves. I saw that statement, but it didn't have any sentence after it telling me where to find it. What is the harm to the public found by the district court where the public is going to be harmed? Usually in these cases they say it's going to poison somebody or something. What was there in the findings? There wasn't. That was the statement. That's the statement. That's the bold statement as to harm. And the problem is on a recall, on a recall, the defendant or the plaintiff would have been able to and should be able to pay the defendant money damages. After all, let's keep in mind what the court did here. While we're challenging all of the injunction, with respect to the remedies, we are not specifically challenging these remedies, but the remedies were stop production, stop advertising, and destroy all product you have. That's what the court ordered. And in addition to that, knowing the standard in the Ninth Circuit that it is a heightened standard, that you have to show harm to the public, the court nevertheless entered these remedies. And we think for the reasons I've stated, the injunction ought to be dissolved, and the remedies, if the injunction is not going to be dissolved, need to be stricken. I will reserve the rest of my time. Thank you, counsel. Good morning. I'm Paul Donohue for Mucos Pharma. May it please the court. Let's start very quickly with that last point. What did the district court, what did Judge Silver have in front of her as to the harm to the public? Well, when she asked on page 12 of the transcript, opposing counsel, prior opposing counsel, if I find a contract, then you have to go to Germany and arbitrate this, don't you? Because there will be a provision. Section 13 says that disputes must be arbitrated in Germany. Counsel stood up and said, no, Your Honor, it should stay right here, because there are public health issues involved. And the public health issues that were involved they were describing was Mucos changing its formula by standardizing the product. As our expert explained, you standardize the enzymes to a known activity level. These are sort of, I don't want to say live, but they're active. They are biological entities. They come from plants and animals. If you have a heart attack, the first thing you'll get is a shot of enzymes to stop the damage. Is that the best you have in the record on public safety? No. That's not the best I have on the record. I have their expert. Their expert stood up and said, we're talking about. So it tells the product that was being distributed in the United States was the same as your company originally distributed in the United States, correct? It absolutely was not. Our product or their product? No, your product originally. Yes. So what was the health hazard when your product was distributed? There was none. So why is there a health hazard now? Because they made 28 million tablets lacking 90% of the key ingredient. 90% of the key ingredient. At the time of the hearing, based on the discovery, that was more than half of their production. So what public health hazard is there in that? The fact that there's a difference doesn't necessarily mean there's a hazard, you may say. Suppose I take one. Am I going to die? No, but the public health issues are that you will not get the efficacy that you're expecting. You're swallowing it for a condition. Usually on these recalls we have some findings. Now we have here there's public health. Yes. Now usually that means to me somebody's going to get sick or somebody's going to die if we let this stuff out there. So then I look for the findings of why there's a public health problem. That is, what will happen to individuals, their health, if these pills remain out there? And I didn't find any findings. They are not receiving the dose that they are expecting to receive. They're being defrauded. So it's a placebo, basically. They're getting something close to a placebo instead of the product represented. Well, why does that demand a recall, as distinct from financial liability later on? Recall is a very different kind of remedy. It's a very different kind of remedy. But there is no standard in the Ninth Circuit in a trademark case that requires a heightened standard for a recall. Yes, if you're going to force the Air Force to abuse their procedures and put someone in office, if you're going to go to the Utah case they cited out of the Tenth Circuit, a district court case in which they relied on, with no discussion of why there was a heightened standard, they said they relied on a case where a university professor wanted to be placed back into. So is it your position that any time there's a trademark infringement, the infringing product can be recalled? Absolutely. Okay. So you're not really relying on any kind of public health hazard. You're relying on the fact that there's an infringement. That's correct. That's correct. But the district judge relied on a public health problem. And the trademark violation as well. Now, the problem I'm having in this case is I sort of look at preliminary injunctions from when I tried cases and when I was a trial judge. Sure. Status quo. Keep the status quo. Well. But the status quo is not kept by recall. And so I look to find findings that would show to me that preliminary. Now, if you'd gotten a permanent injunction and come up here, the argument would be entirely different as far as I'm concerned. But at a preliminary stage, which is just time out until we get to the main event, I seem, I always will look for something more, you know, something you're going to put into all this expense of recalling at the preliminary stage when we're just trying to keep the status quo. What did the district judge tell us? What is the findings that she made that allow us to look to? The cases say that to restore the status quo where there is customer confusion, where there's a competing product out on the shelf side by side, we're going to bring our product out. Consumers are out there. Judge Thomas, you were on the panel in goto.com in which the court said that confusion is the core issue in a trademark case. But their products are on the shelf pretending to be ours. It lacks 90 percent of a key ingredient. It's being sold to the public every day. The status quo is to go back to the pre-infringement at the moment when they decided to go and violate the law. Otherwise, you develop what one court has described as Gund v. Golden Bear calls the moral hazard. I thought the status quo we looked at was at the time of the preliminary injunction, not at the time of the problem occurring. In a trademark case, I believe the courts pretty regularly look at the status quo being let's bring it back, let's bring the infringing product back on the showing that Mukos has made, and then we're at the status quo. Then we can move forward. But that has nothing to do with whether someone is going to be injured or anything. That has to do with copyright. It has to do with trademark. Yeah, trademark. Because our goodwill, we lose control over our goodwill and our reputation. The product's out there being sold. It's inadequate. It's mismarked. It's in violation of federal labeling law. It's identified as the company that supposedly makes it is nonexistent. So the only finding we have is the naked finding of public health. But you're not talking that. You're talking trademark, which whether the public health has interfered or not, you have a right as a trademark owner to be able to stop it. Absolutely. She didn't make those findings. I think she did, Judge. Implicitly, she found that. What did she find was the public health issue? All right. Let me just get a sip of water. We have a product which is sold in Germany as a pharmaceutical. It has been tested through 150 clinical studies in the seven-enzyme version and some clinical studies in the five-enzyme version. It is the second largest selling over-the-counter prescription, non-prescription pharmaceutical in Germany after aspirin. It has a huge reputation in the United States. That's why the trademark is so valuable. And that's why Marlin, when it wanted to stop taking our product, it left us with $2 million worth of inventory sitting in the warehouse, stole our trademark, made a product willy-nilly, lacking 90% of the pancretin. Look at some of the judge's findings about total proteolytic activity. If it's 250 times higher than Marlin standards, they ship it anyway. They ship 6 million tablets after they knew they had made the mistake. They didn't care about the public. The public is out there ingesting these. This isn't something you have sitting on your desk. It isn't a coffee mug or a microphone. This is something the instructions say, take two tablets, I'm sorry, three tablets two times daily. Put it in your mouth. Put it in your body. Let me ask you this question. As I read the court's opinion starting at page 16, she relies more or less equally on the public confusion from the infringing product and the alleged physical potential harm. If we were to find the harm not shown, the physical harm not shown, would we still be required to affirm on the ground that her other reason was supported? Yes, I believe you would, Your Honor. I believe the record supports the finding that the trademark they said, they conceded the sleep-crack factors. There's no doubt about that. You can look at page 12. Judge asked them point blank. Where's the finding? You said supports a finding. Yes. Where's the district court finding? The district court finding is that they waived the sleep-crack factors, that they said it's the same product. It's the same trade dress. It's the same trademark. They absolutely waived all these things, all the issues. There would be confusion. The court found confusion because they waived it. They also, I would point out, if you look at their briefs, they never challenged, they never briefed an issue on the recall. They didn't mention it in their briefs. They put on no evidence to show that it would be harmful to them or cause them any disruption. Now, the court assumed it would be, you know, something they'd have to do and it would be expensive, but they never argued this. Their CEO sat in the courtroom for two days during our hearing, never took the stand. They produced no evidence on this issue of harm to them, no evidence on that it would be of any huge expense for them to do this. I think on the restitution issue, I think the judge was appalled by their behavior, just appalled. Why is that appropriate on a preliminary injunction? I mean, the idea is you keep the status quo and then you go to the remedy phase and the final injunction. Right. Why is restitution properly part of a preliminary injunction? Well, Judge, the best I can offer you is that if restitution is made, people know they have bought an inferior product. It helps us maintain our trademark. It gives them money with which to buy our product. They can actually buy the product that they're expecting to buy. But, again, on a preliminary basis, I mean,  Judge. But what does restitution have to do with maintaining the status quo pending a resolution of the final injunction? The best I can tell you, Judge, is what I've just explained. I mean, I can totally explain to you why a recall is absolutely imperative on a preliminary injunction, why the things have to be brought. And we set those out in a brief at length. But I wasn't asking about that. I was asking about the restitution. I understand you're asking about restitution. I do not have a case in which restitution was affirmed on a preliminary injunction You know, on the recall, for example, you take GoTo. The only thing to have in GoTo is to shut down your website. We didn't say you can't use, you can't advertise your products, you can't put the material on the web, you just can't use that particular confusing trade name. We didn't make them stop business. They can sell whatever product they want under some other trade name. They just can't sell a product and leave it on the shelves for consumers to continue buying when it is mislabeled, as with the bromelain, by 1,000%. I mean, this is the people. Well, that's not really your problem. Your problem is that it contains your trademark. Well, it's a product on a bottle with our trademark that is mislabeled in violation of federal law. It hurts our reputation and goodwill. We actually offered web postings where people said, boy, this product doesn't seem to work anymore. We didn't have them come to trial and testify. That was just impossible at the time. But if you wonder where she might have had this feeling about the ‑‑ But the judge's anchor doesn't ‑‑ No, quite right. We're looking at findings based on the record. Absolutely. So what do you have? I have Dr. Scavetta testify, quote, at ER 260, changing the amount of an enzyme fundamentally alters the product, such that it will no longer have the same efficacy. ER 261, lowering the amount of enzymes affects the efficacy of the product. ER 262‑63, changing the amount of milligrams in the enzymes and wobensine fundamentally alters the product formula. It will not perform as intended. That is the evidence she had in front of her when she made her findings, and when she entered the injunction, Judge. I think that given the ‑‑ we flew our CEO in from Germany. He got on the stand. He testified on the product. We established the value of the trademark. We established that we had developed this over a number of years. Marlon was indeed our exclusive distributor on a purchase order basis, and that continued after January of 2002 on a purchase order basis. They never bought two of the products that they claim were in Section 13. Never bought Fludge Enzyme. Never bought Wobemugas. They complained that the prices set out in that section. Exhibited after that section, they said, we're not going to pay those prices. Those are way too high. Give us an export price or something. So the judges on the contract issue, the judge is faced with someone who has refused, has rejected the contract, cherry picked when it really appeals to them, and has also said, you know, we're not going to go to Germany to sue. We want to do it right here. And they teed up public health issues right off the bat. Now, it is important to realize that a heightened standard is not required in a recall case, and I would suggest. Well, we don't have any cases one way or the other on that. There is one Southern District of Health cyber media case I believe deals with this issue. It's a Southern District of Health. The Ninth Circuit does not have this on a recall basis. Other circuits do. Second Circuit does. We cited a number of those cases. And remember. We have commented, though, upon mandatory injunctions at the preliminary stage. In our Anderson v. United States case. Absolutely. We indicated that we frowned upon. Let me ask you a question. You'll run over a little bit on this. It will be helpful. My water, too. It's cold. It's going to stop the court one of these days. You're the plaintiff in the case. No, we're actually the defendant, Your Honor. We were sued here by our ex-distributors. I understand. We're the movers on the preliminary trial. You're moving towards some type of resolve. Yes. On your cross-claim. What has happened since the injunction? Has there been a pretrial? Has there been notice of pretrial? What have you been doing? We have had a knock, if I may continue, a knockdown, drag-out fight over their contempt of the order. They have refused to obey the order as entered. We started on January 30th. That has been litigated through until a finding of contempt on August 19th through three days of hearings. That's not before us directly. Absolutely it's not. I'm telling you, if you just want to know what's been happening in the case. No, I didn't even want to know what's happened. I was wanting to know why counsel have not followed our sports forum case and gone ahead with the permanent injunction. All of these issues would be so easy if we were at permanent injunction. And for some reason very often district court judges or maybe attorneys, I don't know, want to wait and see what our law is going to say when we've told them in sports forum the whole thing may change at permanent. And so I guess what you're saying is absolutely nothing has been done towards getting this to a permanent injunction. Not entirely, Judge. No, no. We've changed discovery. We've had some depositions. We have not completed discovery and we have not had the hearing. So the war is going on over the preliminary injunction, but nothing has happened towards getting it to a permanent. Some things have happened, but it's not been resolved. So that makes us even more concerned, I suppose, when we think of status quo, because we usually think of that as temporary. But if it's going to take one year or two years or three years to get to the permanent injunction, then we have to be a little more careful about what we allow for status quo. And that's the issue that's bothering me. It isn't the rest of them. Of course not. Or how it's going to come out eventually. And I don't know how to handle that. I guess what we could do, I suppose what would happen would be one result that would be less unfavorable to your client. So I wanted to give you every opportunity to let us know what has happened so far. Well, I can tell you that we have pursued discovery. We have subpoenaed 20 non-parties for documents. We have taken the deposition of the president of Marlin. We have taken the deposition of their head of marketing, Lisa Nelson. What's left of the case? What are you going to seek in your final, once you go to a hearing, a final trial on the merits? What additional remedies are you going to seek? We would have a contract claim for the $2 million in inventory that they left us with in Berlin, sitting in our warehouse, that they refused to take. And, no, we would have the same trademark claims, yes. Okay. And when do you anticipate that trial to take place? I would imagine it will happen fairly promptly once the judge rules on the current matters that are pending, which we expect any day. Before the end of the year? Is that fairly promptly or into next year? Possibly, Judge. It's just that I know they want us to bring witnesses in from Germany, and sometimes that's just a schedule. We volunteer to bring them to Chicago. We just sometimes that takes a little scheduling issues. So that would be that problem. All right.  Thank you. Thank you. Sorry we're in New York, but I thought we needed to have that information. No, I appreciate that. And thank you for being candid with it. Mr. Exine. I'd like to address several points. Number one, there isn't confusion. It wasn't admitted. And if you will look at page 26 of the Ampelese brief, you will see a quote from Mr. Critt. And there's an ellipsis in the first paragraph, and it says it's the same goods. And what they leave out is the statement from counsel, whatever slight variations, we would maintain avoid confusion. Now, we don't even get to that issue if you find, as I believe you should, that the section 13 provided for an implied license. At the very least, at the very least, it was a closed question as to whether or not. It was the ceasing of production, which was a sine qua non of paragraph 13.3. Yes. And you determine that under German law. And under German law, if the composition of the product that was agreed to earlier in section 13 is changed, there is a defect. And under section 4, I think it's 474 of the German Civil Code, section 2, you're entitled to terminate the product, terminate the contract at that point. So it's clear, and the judge was operating on the assumption that if there was a defect under German law, there would be a termination or a ceasing of the manufacturing of the product. But, Your Honor, at the very least, at the very least, it was a closed question. And Lukos Marlin was entitled to make the judgment it made. And if it made it, this was not the kind of case where it willy-nilly went out and used a trademark. It had a basis for doing so. And given the law in the Ninth Circuit that there's a heightened standard for mandatory injunctions, the court needs to take that into consideration. I have nothing further to say but would be happy to answer any questions you have. Let me ask you a question. What findings are there in the record that show a health hazard? None, Your Honor. There's a bald statement. Now, Counsel, there's large changes, but I don't know what those large changes made. Did the district judge make any findings as to the effect of those large changes? The district court did not, Your Honor. And what's sauce for the goose is sauce for the gander here because their product changed. On page two of the court's opinion, she makes absolutely clear that the Lukos product changed. So if there are health hazards for Marlin because the Marlin changed. Well, unfortunately, you don't have the same you have a different problem than they have. You have an injunction calling for a recall, which you're at war on. But I suppose we're going to have to find ‑‑ I suppose we're going to have to look and see if there are some findings that show a health hazard. Assuming we find none, the other argument is they're entitled to the recall because they have a preliminary injunction on a trademark infringement. And how would you respond to that? Well, I respond to it by saying there's still the heightened standard. I realize there's no case in the Ninth Circuit that says that. But there has to be a demonstrated confusion. And the court says that was acknowledged or admitted, and that's just not so. And I think the record is not sufficient to demonstrate confusion. But even so, I mean, I think there's a critical difference here. Mucose wasn't even in the market in the United States in November or any time before at least December of 2007. So how can there be confusion? They're not in the marketplace. And the court makes a, quote, finding saying the sleep craft factors have been shown or admitted. And they're not even in the market. That just can't be that there's confusion when they're not in the market. Thank you, counsel. Thank you. The case is heard and resubmitted. We'll proceed to the final case on this morning's calendar, which is United States v. Mitchell.
judges: Wallace, Thomas, Graber